**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

**NANCY CONNER,**

> **Plaintiff,**

**vs.**                                              **Case No. 1:08cv252-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

> **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the

decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Nancy Conner, applied for disability insurance benefits and

supplemental security income benefits.  Plaintiff was 50 years old at the time of the first

administrative hearing (on February 26, 2007), has three years of college in nursing,

and has past relevant work as a registered nurse. Plaintiff alleges disability due to mental impairment.

The Administrative Law Judge found at step 2 that Plaintiff had "severe" impairments of a personality disorder and an adjustment disorder with mixed anxiety and depression. R. 22. He also found that Plaintiff had the residual functional capacity to perform work at all exertional levels with some limitations. He found that Plaintiff was unable to perform her past relevant work, but could perform work as a computer operator, medical laboratory technician, and a film developer. Consequently, he determined that Plaintiff was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified at the first hearing on February 26, 2007, that she had worked 23 years as a registered nurse.  R. 240.  At the time of the hearing, she was working once a week, helping a friend pack produce.  *Id.*  She rode her bicycle 6 miles to do that work, and was paid with food (the produce).  *Id.*  She was hoping this activity would grow into a regular job.  *Id.*  Plaintiff said that she lived alone on ten acres of land that her father had helped to purchase.  R. 242.  She had dogs, cats, two goats, a horse, and a pony.  *Id.*  She had had horses for 15 years.  *Id.*  She also had fruit trees and nut trees, and wanted to plant more fruit and nut trees.  R. 242-243.  For income, Plaintiff

took care of a pet and a house for a nearby friend. R. 243. In exchange, the friend

placed her on her cellphone plan and paid her electric bill. *Id.*

Plaintiff said she stopped her nursing work because it became harder and harder

to get along with coworkers. R. 244. She said that getting along with coworkers "was

probably the main thing." R. 245. When asked if she thought she could do other work,

Plaintiff said she liked the produce job and was hoping it would grow into something

more. *Id.* She said that the produce work was "freeing" because it lacked the

responsibilities of nursing, but acknowledged that "pretty much you have to be able to

get along with folks no matter what you're doing." *Id.*

The hearing reopened on March 12, 2008, and a psychological report (Dr.

Benet's report, discussed ahead) was admitted into evidence. R. 249. Plaintiff said that

in the fall of 2007, she tried a couple of jobs. R. 251. She worked as a cashier in a

convenience store, working six and one-half days, but was terminated. *Id.* She worked

two weeks in a clinic in Alachua, Florida, helping the IV nurse and cleaning around the

premises, but her employer did not have enough need ("enough hours") to keep her

working. R. 252.

A vocational expert was called as a witness and testified that Plaintiff's skill level

in nursing was level 7, among the skilled occupations. R. 257. The ALJ asked the

expert hypothetically to assume a person with no exertional limitations, with no

limitations in the ability to understand, remember, carry out instructions, but with

moderate limitations in her ability to interact appropriately with supervisors, coworkers,

and to respond to changes in a work setting. R. 258-259. This was the residual

functional capacity that the ALJ to be appropriate for Plaintiff. R. 24. The vocational

expert said that such a person could do work as a computer operator, medical

laboratory technician, and film developer.  R. 259-260.

**Legal analysis**

Plaintiff contends that the ALJ erred by finding Plaintiff's testimony not credible.[1]

As a consequence, Plaintiff argues that the hypothetical put to the vocational expert did

not include all of Plaintiff's "credible" limitations.  Doc. 13, p. 1.

Plaintiff did not testify to any particularly significant mental impairments.

Although she said she had difficulty returning to her past work as a registered nurse,

she seems to have acknowledged that she could work in a job packing produce, as a

cashier in a convenience store, and as a helper for another nurse.  She said she lost the

latter two jobs for reasons other than any alleged disability.  Consequently, the ALJ in

fact could not have failed to credit her testimony.

Nonetheless, he did so.  The ALJ said that he did not find Plaintiff's testimony as

to the "intensity, persistence and limiting effects" of her symptoms to be credible to the

extent inconsistent with his residual functional capacity determination.  R. 25.  The ALJ

said that Plaintiff worked as a nurse from 1982 to 1993, and had never been fired from

that work even though she had emotional problems and was in psychotherapy from

June 28, 1989, to January 24, 1991.  R. 25.  He noted that current psychological

evaluations by two sources "reveal that the claimant has interpersonal problems which

would prevent her from returning to her job as a nurse, but which would not prevent her

---

[1] "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so."  Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).

from performing other, less stressful functions requiring less intense contact with others." *Id.*

These findings are supported by substantial evidence in the record. With respect to the earlier mental health treatment, Robert Glazer, Ph.D., said he treated Plaintiff from June 28, 1989, to January 24, 1991. R. 159. The treatment records are not in evidence. Plaintiff saw Dr. Glazer about once a week during that period. *Id.* She had "acute symptoms of suicidal ideation, dysfunctional depression, excessive crying episodes, and occasional but intense panic attacks." *Id.* He said that her "symptoms were at times extremely self-destructive and required her having to take leave of absences from her work." *Id.* He said, without specificity, that the "roots of psychological permanent and full disability were during the time period she received treatment from me." *Id.* He said her diagnosis was depressive neurosis, and her prognosis "was not positive." *Id.* Dr. Glazer said he had no awareness of her mental condition since 1991. *Id.*

The first of the two more current mental evaluations was conducted on May 11, 2005, and fully discussed by the ALJ. R. 25. Andres Nazario, Ph.D., a licensed psychologist, saw Plaintiff on a consultative basis on that date. R. 160. He found Plaintiff to be cooperative throughout the interview. *Id.* She alleged disability due to anxiety, post traumatic stress disorder, and panic attacks. *Id.* She reported that she was very sensitive, and did not cope well with stress. *Id.* She said she had stopped work at Shands Teaching Hospital in Gainesville, Florida, "because of an accumulation of 'things.' " *Id.*

Plaintiff reported that she did not have panic attacks as frequently now, but suffers one about once "every few months." R. 160-161. Plaintiff said her family had a history of mental illness. R. 161. She said that her son had committed suicide in 1993, and her brother also committed suicide. *Id*. She said that on the surface, she functions well, but a lot was going on underneath. *Id*. She said that she considered suicide in 1995 when the panic attacks were very bad. *Id*. She said that she was not taking any medication, but "manages herself with diet and exercise, music and dancing and herbal therapy." *Id*.

Plaintiff said that she was able to go grocery shopping. *Id*. Dr. Nazario said:

> Ms. Conner describes her daily activities as getting up, making coffee and feeding the animals. She reports that she watches a couple of hours of television and works in the house and the yard. She reports that she does a lot of aerobic therapy, gardening, and bike riding. She repo[r]ts that she has 10 acres that she is taking care of and wants to be an artist and a farmer. She describes her social activities as having a good friend that she visits down the road, and going to church once a week. She reports that she keeps in touch with her children.

R. 161.

During the interview, Dr. Nazario said that Plaintiff was "alert and cooperative," her mood seemed stable, her affect was appropriate, and she was oriented to person, place, and time. R. 162. She performed the memory tests well. *Id*. "She was persistent in her approach, and her pace appeared adequate." *Id*. There was no evidence of suicidal ideation. *Id*. Plaintiff appeared to be of average intelligence, and her judgment and insight were fair. *Id*.

Dr. Nazario determined that diagnoses of post traumatic stress disorder and adjustment disorder with depressed mood, chronic, were consistent with Plaintiff's

reported symptoms. *Id.* Dr. Nazario recommended "psychological intervention to assist [Plaintiff] in developing coping strategies to deal with her emotional condition, and family conflicts," but Plaintiff said: "I do my own therapy." *Id.* Dr. Nazario concluded that Plaintiff appeared able to "concentrate, able to understand and follow direction," and "appears able to interact with others appropriately." *Id.*

The second mental status examination was conducted on a consultative basis by William E. Benet, Ph.D., on May 30, 2007. R. 223. This was also fully discussed by the ALJ, and given significant weight. R. 26. Indeed, Dr. Benet's opinion forms the basis of his residual functional capacity assessment.

Dr. Benet reviewed the report by Dr. Nazario. R. 223. Plaintiff said that her chief complaint was that she could not handle stress any more. *Id.* She attributed the onset of her stress to a series of personal tragedies, starting with the death of her son in 1993 when he was age 20. R. 224-225. Her mother then died of cancer and her father of a heart attack. R. 224. Three brothers died of heart-related problems. *Id.* She had also been in litigation over custody of her daughter since her daughter was one year old. *Id.*

Plaintiff reported no suicidal ideation, and only "some depression." R. 224. She said she worried a lot, but slept well and had a good appetite. *Id.* She had no loss of interest in activities. *Id.* Plaintiff was not seeing anyone for mental health counseling or treatment. *Id.*

Plaintiff said that she left nursing work because she was having increasing problems coping with difficult patients, which she attributed to her own low self esteem. R. 225. Her nursing license was still active. *Id.* She worked one day a week packing

organic produce. *Id.* Her driver's license had been revoked for failure to pay child support. *Id.*

Plaintiff said that she enjoyed swimming in the Santa Fe River, about a mile and one-half from her property, riding her bicycle, walking, and reading. R. 225. She said that during a typical day, she had coffee, took the dogs for a run, rode her bicycle, fed her friend's cat, took the goats into the yard, and found other things to do. *Id.* She wanted to plant fruit trees. *Id.* She said that she could not take the stress of nursing any more. *Id.*

On examination, Dr. Benet found Plaintiff to be alert, oriented, healthy looking, and neatly dressed and groomed. R. 226. She looked sad, but was friendly and cooperative. *Id.* Eye contact was good, speech was soft but coherent and very articulate, and her thinking was organized and goal directed. *Id.* Plaintiff often smiled, but her mood was sad and depressed. *Id.* Her attention and concentration were good, her short term memory was above average for her age, her verbal reasoning was superior, and her judgment was adequate. *Id.* Her general intellectual ability "was estimated to be well above average." *Id.*

Dr. Benet administered the Minnesota Multiphasic Personality Inventory-2, and a valid profile was obtained. R. 226. He said that persons with this profile "are likely to be tense, irritable, quick-tempered and resent authority and the demands of others." *Id.* He said this persons with this profile are often "quick to react to perceived provocations of others but are reluctant to admit their own provocations." *Id.* He said that persons with this profile are "often seen as stubborn, argumentative and oversensitive." *Id.* "Motivation to change is characteristically poor." *Id.* Dr. Benet also said: "A significant

elevation of scale 3 further suggests a strong need for affection expressed in egocentric, demanding, and manipulative ways." *Id.* Dr. Benet concluded:

> Cognitive functioning was intact, with no impairment of reasoning or memory functioning; in fact, general intellectual ability was estimated to be well above average. Ms. Conner's clinical presentation, history and test scores suggest an adjustment disorder with mixed anxiety-depression and significant personality maladjustment. She should be able to perform work-related mental tasks involving understanding and memory, but is likely to be mildly to moderately impaired in her ability to perform tasks involving sustained concentration and persistence, social interaction and adaptation. Improvement may be expected with appropriate psychiatric/psychological treatment.

R. 228. Dr. Benet assigned a current GAF score on Axis V of 60, on the borderline between moderate and mild impairment.[2]

Dr. Benet then filled out a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" form. R. 229-231. The only limitations found are moderate limitations in interactions with others and responding appropriately to usual work situations or changes in routine. R. 230.

The ALJ's residual functional capacity assessment essentially adopted the limitations found by Dr. Benet. Plaintiff did not testify to any limitations greater than that.

---

[2] GAF is the Global Assessment of Functioning Scale. "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002). A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers). A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning ( e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

Indeed, her testimony did not describe any significant limitations in any detail.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and were based upon substantial evidence in the record. The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on September 14, 2009.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**